1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONSERVATION FORCE, et al.,

        *Plaintiff-Petitioner*

        v.

SALAZAR, et al.,

        *Defendants.*

No.  1:09-cv-00495 BJR
     1:10-cv-01262 BJR

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS
*CONSERVATION FORCE I*, STRIKING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGEMENT ON
*CONSERVATION FORCE I*, DENYING
DEFENDANTS' MOTION TO STAY
*CONSERVATION FORCE II*, AND
GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO
DISMISS *CONSERVATION FORCE II*

      This matter comes before the court on: (1) Defendants' Motion to Dismiss Plaintiffs'
Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and (2)
Defendants' Motion to Dismiss or, Alternatively, to Stay Litigation.[1] The motions were filed in
*Conservation Force, et al. v. Salazar, et al.*, 1:09-cv-00495 (BJR) (*Conservation Force I*) and
*Conservation Force, et al. v. Salazar, et al.*, 1:10-cv-01262 (BJR) (*Conservation Force II*). The

---

[1]    In issuing this order, the court did not consider Defendants' Supplemental Authority filed
on August 31, 2011.  (*Conservation Force I*, Dkt. No. 32; *Conservation Force II*, Dkt. No. 15.).

ORDER-1

facts that gave rise to *Conservation Force I* also form the basis for *Conservation Force II*. These cases concern the markhor, a wild goat species that lives in the rugged mountainous areas of Afghanistan, India, Pakistan, Turkmenistan and Uzbekistan. The sub-species at issue is the straight-horned markhor or *Capra falconeri jerdoni*, which inhabits the Torghar Hills of the Balochistan Province of Pakistan. In 1976, the United States Fish and Wildlife Service ("Service" or "FWS") listed the straight-horned markhor as endangered under the Endangered Species Act 16 U.S.C. §§ 1531-1534 ("ESA" or the "Act").  41 Fed. Reg. 21,062, 24,067 (June 14, 1976).

The parties to *Conservation Force I and II* are identical. The plaintiffs describe themselves as a group of hunter/conservation organizations (Conservation Force, Dallas Safari Club, Houston Safari Club, African Safari Club of Florida, Wild Sheep Foundation, Grand Slam Club/OVIS and the Conklin Foundation), individual permit applicants (Jerry Brenner, Steve Hornady, Barbara Lee Sackman and Alan Sackman), and international conservationists (Sardar Naseer A. Tareen of the International Union for Conservation of Nature ("IUCN") and the Society for Torghar Environmental Protection ("STEP"). Defendants are Kenneth Salazar, Secretary of Interior (the "Secretary"); Rowan Gould, Acting Director of the United States Fish and Wildlife Service (the "Director"); and the FWS.

For the reasons outlined below, the court will GRANT Defendants' Motion to Dismiss *Conservation Force I*. The court will also DENY Defendants' Motion to Stay Litigation and GRANT in part and DENY in part Defendants' Motion to Dismiss *Conservation Force II*.

## I.    BACKGROUND

### A.  Statutory Background

The ESA is "the most comprehensive legislation for the preservation of endangered

ORDER-2

species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). It is intended to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Hill*, 437 U.S. at 180 (quoting 16 U.S.C. § 1531(b)). The Act directs the Secretary to classify species whose survival is in danger as "endangered" or "threatened." 16 U.S.C. § 1533.   A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

The ESA permits individuals to petition the Secretary to list, downlist, or delist species. 16 U.S.C. §1533(b)(3). After receiving a petition, the Secretary is obligated to, "[t]o the maximum extent practicable," make a finding within 90 days "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). Further, "[w]ithin 12 months after receiving a petition that is found . . . to present substantial information indicating that the petitioned action may be warranted," the Secretary must determine whether the petitioned action is warranted, is not warranted, or is warranted but is precluded by pending proposals concerning other species ("12-month finding"). 16 U.S.C.  § 1533(b)(3)(B).

The ESA also generally prohibits the importation of endangered and threatened species, and this prohibition explicitly includes hunting trophies. 16 U.S.C. § 1538(a)(1)(A), (c)(2); 50 C.F.R.  §§  17.21(b),  17.32.  However,  certain  species  may  be  imported  under  limited circumstances, such as "for scientific purposes or to enhance the propagation or survival of the

ORDER-3

affected species." 16 U.S.C. § 1539(a)(1)(A). Individuals requesting permission to import a listed species must apply for a permit and satisfy the application requirements. 16 U.S.C. § 1539(a); 50 C.F.R. §§ 17.22, 17.31(a).

In addition, the ESA implements the participation of the United States in an international agreement called the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). CITES is designed to prevent the extinction of species due to international trade, providing that "[t]rade in specimens of [Appendix I] species must be subject to particularly strict regulation in order to not endanger further their survival and must only be authorized in exceptional circumstances." CITES, art. II(1).

## B. Factual Background and Procedural History

Markhor populations have generally declined as a result of hunting, habitat modification, and competition with domestic livestock. 64 Fed. Reg. 51,499 (Sept. 23, 1999). However, the Torghar Hills population of the straight-horned markhor has increased substantially from approximately 100 animals in the mid-1980s to more than 2,000 today.[2] 64 Fed. Reg. at 51,500. The vitality of the population is attributed to the Torghar Conservation Project ("TCP"), a community-based conservation program initiated in early 1985 through the efforts of the local Pathan tribal chieftain and STEP, in consultation with professional wildlife biologists from the United States. (*Conservation Force I*, Dkt. No. 10 at 5-6.). TCP provides an incentive to conserve markhor and its habitat by providing economic benefit to the local community. *See* 64 Fed. Reg. at 51,500. Specifically, TCP limits the number of permits available for sport-hunted markhor trophies; the purchase of the permits provides significant economic benefit to the local community. (*Conservation Force I*, Dkt. No. 10 at 22-23.). In addition, TCP employs local

---

[2]    Defendants appear to contest this number, alleging that there are only "1,250 free-ranging endangered markhors in the wild…." *See Conservation Force I*, Dkt. No. 20, Ex. 1 at 1.

ORDER-4

Pathan tribesmen as game guards to protect the Straight-horned markhor from unauthorized hunting in the project area (an area of approximately 1,500 square kilometers). 64 Fed. Reg. at 51,500. Many of the game guards are former hunters who stopped killing markhor at the behest of the local Pathan tribal chieftain. *Id*. The game guards have virtually eliminated unauthorized hunting within the project area. *Id*. TCP is entirely self-sufficient, depending solely on revenues derived from trophy hunting fees from international hunters. 64 Fed. Reg. at 51,500.

The success of TCP has been recognized internationally. On August 18, 2003, the Service issued a Federal Register Notice announcement in which it found that TCP had "significantly enhanced" the markhor survival. 68 Fed. Reg. 49,512 (Aug. 18, 2003) ("[T]he Torghar Hills region of Pakistan has a successful community-based management program that has significantly enhanced the conservation of local markhor populations."). In addition, the 178 Parties of CITES have authorized and established a special trade quota for Pakistan of 12 markhors annually. Res. Conf. 10.15 (Rev. CoP14); 64 Fed. Reg. at 51,500. Finally, the Service has actively supported TCP through a grant program managed by the Division of International Conservation. (*Conservation Force I*, Dkt. No. 20, Ex. 1 at 2.).

Plaintiffs contend that American hunters represent the largest market of sportsmen interested in hunting the straight-horn markhor, and most significantly, are willing to pay the highest price for the privilege of so doing. (*Conservation Force I*, Dkt. No. 10 at 23.). Plaintiffs claim that markhor hunts are currently sold for $45,000, but that American hunters, if they were able to import markhor trophies, would be willing to pay at least $150,000 per hunt. *Id*.

### 1.    Petition to downlist the straight-horned markhor

On March 4, 1999, the Service received a petition filed by Plaintiff Tareen on behalf of STEP and the IUCN Sustainable Use Specialist Group of Asia, requesting that the straight-

ORDER-5

horned markhor be reclassified from endangered to threatened.   64 Fed. Reg. 51,499. On September 23, 1999, the Service published its 90-day finding that the petition presented substantial information indicating that the action may be warranted (a positive substantial information finding) and that a status review of the entire species was being initiated. *Id*. To date, a 12-month finding has not issued. (*Conservation Force II*, Dkt. No. 1 at 12.).

While waiting for the Service to issue the 12-month finding, Plaintiff Tareen alleges that he met with officials from the Services' Division of Scientific Authority on several occasions in the summer of 2004. *Id*. He alleges that during these meetings he was assured that despite the Service's delay in issuing the 12-month finding, the Service was continuing its comprehensive status review of the entire species *Capra falconeri*, and that downlisting the straight-horned markhor population of the Torghar Region was warranted. *Id*. Plaintiff Tareen also alleges that the Service represented that it would begin granting import permits for markhor trophies regardless of the downlisting. *Id*.

### 2. Applications to import straight-horned markhor trophies

On December 19, 2003, Plaintiff Hornady submitted an application to import a personal sport-hunted straight-horned markhor trophy from Pakistan. (*Conservation Force I*, Dkt. No. 10 at 10.). He alleges that he submitted the application in reliance on the Service's announcement in 68 Fed. Reg. 49,512 that it intended to start issuing permits. *Id*. He took a straight-horned markhor in January 2004. *Id*. The Service did not act on the permit application for nearly six years. *Id*. The Service eventually denied the permit application by letter dated October 27, 2009 (later amended on November 3, 2009). (*Conservation Force I*, Dkt. No. 20 at Ex. 1.).

Plaintiffs Barbara and Alan Sackman both took a straight-horned markhor under TCP in March 2008. (*Conservation Force I*, Dkt. No. 10 at 11.). Each filed an import permit application

on June 10, 2009. *Id.* Plaintiff Brenner took a straight-horn markhor as part of the TCP program in March 2009 and submitted an import permit application on June 10, 2009. *Id.* at 10. The Service denied all three applications by letters dated October 27, 2009 (later amended on November 3, 2009). (*Conservation Force I*, Dkt. No. 20 at Ex. 1.). The denial letters were identical in all respects. *Id.*

In denying the permit applications, the Service conceded that the import requests were not for "purposes that are detrimental to the survival of the [straight-horned markhor]…[t]herefore, the criteria for authorization under CITES was meet [sic]." (*Conservation Force I*, Dkt. No. 20, Ex. 1 at 1.). The Service further recognized that "sports hunting plays a role in the management goals for [straight-horned markhor]…." *Id.* at 2. Nevertheless, the Service found that there is "insufficient information" to determine whether the importation of the [straight-horned markhor] trophies would "enhance survival or propagation of the wood bison [sic] pursuant to Section 10 of the Act." *Id.* at 3. The Service went on to say that it was concerned that "there would be an increase in permit applications from U.S. citizens seeking importation of trophies…consequently one probable direct effect of issuing a permit would be the increase[d] pressure on the Pakistani government to authorize the lethal take of [straight-horned markhors]." *Id.* at 2. The Service noted that there are "only approximately 1,250 free-ranging endangered markhor in the wild…and [it] is concerned that an increase in demand could lead to an unsustainable increase in offtake." *Id.*

### 3. *Conservation Force I*

On January 14, 2009, plaintiffs notified the Service of their intent to file suit ("NOI") pursuant to the 60-day notice requirement of Section 11 of the ESA. (*Conservation Force I*, Dkt. No. 11 at Ex. 1.). The NOI stated two perceived violations of the ESA:  (1) failure to make the

ORDER-7

12-month finding, and (2) failure to issue permits allowing importation of straight-horned markhor hunting trophies.[3] *Id.*

In March 2009*,* Plaintiffs filed *Conservation Force I.* (*Conservation Force I*, Dkt. No. 1.). In it, plaintiffs object to the Service's failure to process the individual plaintiffs' import permit applications, failure to make a timely 12-month finding, and failure to undertake a required five-year status review of the markhor ESA listing. *Id.* Defendants moved to dismiss the complaint on jurisdictional grounds and for failure to state a claim. (*Conservation Force I*, Dkt. No. 4.). Plaintiffs amended the complaint on June 6, 2009 (*Conservation Force I*, Dkt. No. 7) and amended it a second time on June 22, 2009. (*Conservation Force I*, Dkt. No. 10.). Defendants moved to dismiss the second amended complaint on July 7, 2009 pursuant to 12(b)(1) and 12(b)(6). (*Conservation Force I*, Dkt. No. 11.). This motion is presently before the court.

On August 26, 2009, plaintiffs moved for summary judgment. (*Conservation Force I*, Dkt. No. 16.). Defendants moved to stay the motion pending resolution of the motion to dismiss. The court granted defendants' stay request via a minute order issued on September 4, 2009. (*Conservation Force I*, Dkt. No. 17.). On October 27, 2009, the Service denied each of the individual plaintiffs trophy import permit applications (*Conservation Force I*, Dkt. No. 20), and on September 22, 2010, the court requested briefing on whether the case is moot in light of the Service's decision. (*Conservation Force I*, Dkt. No. 23.). The case was reassigned to this court on November 29, 2010. (*Conservation Force I*, Dkt. No. 26.).

**4.    *Conservation Force II***

On November 3, 2009, plaintiffs submitted a second NOI to the Service (*Conservation*

---

[3]    As of January 14, 2009, the permit denials had not issued.

*Force II*, Dkt. No. 1, Ex. 1) and, thereafter, filed *Conservation Force II* on July 23, 2010. (*Conservation Force II*, Dkt. No. 1.). The case was designated related to *Conservation Force I*. (*Conversation Force II*, Dkt No. 2.). In *Conservation Force II*, Plaintiffs challenge the Service's denial of the four import permits, and the Service's alleged failure to undertake a five-year status review of the markhor's ESA listing. (*Conservation Force II*, Dkt. No. 1 at 30-32.). Plaintiffs also argue that the denial of their import permits violates their right to due process pursuant to § 706 of the APA, and re-allege their objection that the Secretary has breached a bundle of his duties under the ESA. *Id.* at 33-38. Defendants move to dismiss these claims, as well as plaintiffs' allegations contained in Claims I and IV that the Secretary failed to meet his obligations under 16 U.S.C. § 1537(b) to encourage foreign conservation. (*Conservation Force II*, Dkt. No. 9 at 1.). In the alternative, Defendants move to stay the action pending resolution of *Conservation Force I. Id.* This motion is also before the court. The case was reassigned to this court on January 27, 2011. (*Conservation Force II*, Dkt. No. 12.).

## II.   STANDARD OF REVIEW

### A.  Fed. R. Civ. P. 12(b)(1)

Under Rule 12(b)(1), a party seeking to invoke the jurisdiction of a federal court has the burden of establishing jurisdiction. *U.S. Ecology, Inc. v. Dep't of Interior*, 231 F.3d 20, 24 (D.C.Cir.2000); *see also Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."). A court considering a Rule 12(b)(1) motion to dismiss must give Plaintiffs all favorable inferences that may be drawn from the allegations of fact. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) overruled on other grounds by *Davis v. Scherer*, 468 U.S. 183 (1984); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C.Cir. 2000).

ORDER-9

1
2
3
4
5
6
7
8
9
10
11

However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). Nor need the court accept "a legal conclusion couched as a factual allegation," or "naked assertions [of unlawful misconduct] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009) (internal quotation marks omitted). Further, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court is not limited to the allegations set forth in the complaint, "but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Alliance for Democracy v. FEC*, 362 F.Supp.2d 138, 142 (D.D.C.2005); *see also Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992).

12

### B.  Fed. R. Civ. P. 12(b)(6)

13
14
15
16
17
18
19
20
21
22

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint will survive a 12(b)(6) motion "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. This approach allows a court to identify the factual allegations entitled to an assumption of truth, and then determine "whether they plausibly suggest an entitlement to relief." *Id.* at 1950–51.

23
24

### III.  DISCUSSION

25

#### A.  *CONSERVATION FORCE I*

Defendants have moved to dismiss *Conservation Force I* in its entirety. For the reasons

discussed below, the court will grant the motion. Claim I, which is based on the Service's failure to timely issue a 12-month finding, is time-barred. Claims II and III, which challenge the Service's failure to process the plaintiffs' import permit applications are moot and/or fail to state a claim upon which relief can be granted. The Fourth Claim is time-barred to the extent that it relies on the Service's failure to issue a 12-month ruling, moot to the extent that the claim relies on the Service's failure to rule on plaintiffs' permit applications, and not judiciable to the extent that it alleges maladministration under 16 U.S.C. § 1540(g)(1)(A). Claim Five, the Service's failure to conduct a five-year status review, fails for lack of subject-matter jurisdiction.

### 1.    Claim I: Failure to Issue 12-Month Finding

Plaintiffs' first claim is a citizen-suit challenge to the Service's failure to make a 12-month finding that became due in March 2000. The ESA permits any individual to commence a civil suit alleging a failure of the Secretary to perform any act or duty under section 1533 that is nondiscretionary. 16 U.S.C. § 1540(g)(1)(C). The ESA prescribes no statute of limitations; therefore, 28 U.S.C §2401(a), the general six-year statute of limitations for civil actions against the federal government, provides the applicable limitations period. *Felter v. Norton*, 412 F.Supp.2d 118, 124 (D.D.C. 2006) ("Section 2401 is a general catchall statute that applies to all civil actions against the government....") *aff'd in relevant part, Felter v. Kempthorne*, 473 F.3d 1255 (D.C.Cir. 2007); *Kendall v. Army Bd. for Corr. Of Military Records*, 996 F.2d 362, 365 (D.C.Cir. 1993) (Section 2401(a) applies to "all civil actions whether legal, equitable, or mixed.")

The D.C. Circuit has long held that "section 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity," and as such, must be strictly construed. *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987) (citations omitted); *W.VA.*

ORDER-11

*Highlands Conservancy v. Johnson*, 540 F.Supp.2d 125, 138 (D.D.C. 2008); *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C.Cir. 2008). This is significant because a jurisdictional statute of limitations "cannot be overcome by the application of judicially recognized exceptions such as waiver, estoppel, equitable tolling, fraudulent concealment, the discovery rule, and the continuing violations doctrine." *W.VA. Highlands Conservancy*, 540 F.Supp.2d at 138 (quoting *Felter*, 412 F.Supp.2d at 122). Instead, a "single violation…accrues on the day following the deadline" and a suit challenging such a violation is barred if filed outside the six-year limitation period. *Center for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006). The expiration of the statue of limitations is "construed as a bar to the court's subject matter jurisdiction, and thus a proper subject of a motion to dismiss under Federal Rule 12(b)(1)." *Felter*, 412 F.Supp.2d at 122.

Plaintiffs filed their petition requesting that the straight-horned markhor be reclassified from endangered to threatened on March 4, 1999. (*Conservation Force I*, Dkt. No. 11 at 9.). Therefore, the statutory deadline for publishing the 12-month finding on the downlist petition was March 4, 2000. *Id.* Allowing for the ESA's 60-day notice requirement, *see* 16 U.S.C. § 1540(g)(2)(C), plaintiffs could have maintained their suit on May 4, 2000. Accordingly, plaintiffs' action accrued on that day. Plaintiffs concede that the six-year limitations period began to run on May 4, 2000, and that they did not file *Conservation Force I* until March 3, 2009, nearly nine years after the claim accrued. However, plaintiffs argue that May 4, 2000, was merely the first violation of section 1533 and that each day that passed without action by the Secretary created an additional cause of action triggering anew that statute of limitations. *See Conservation Force I*, Dkt. No. 14 at 13-14.

Plaintiffs' argument is without merit. As previously discussed, *supra* at page 12, courts in this Circuit do not apply the doctrine of continuing violations to § 2401(a). *See, e.g., P & V Enters.*, 516 F.3d at 1026 citing *Spannaus*, 824 F.2d at 55.[4] As such, this court finds that the Service's violation of the 12-month finding deadline was a one-time event on which the statute of limitations expired on March 4, 2006. Therefore, Claim I is time-barred and must be dismissed.[5]

### 2.    Claim II: Violation of Due Process

Plaintiffs' second claim alleges violations of their due process rights. Plaintiffs argue that the markhor trophies are their "personal chattel property" in which they have a protected

---

[4]    In 2006, the D.C. Circuit Court appeared to contemplate that the doctrine of continuing violations could reset the § 2401 limitation period. *See The Wilderness Society v. Norton*, 434 F. 3d 584, 588 (D.C.Cir. 2006). In *Wilderness Society*, the plaintiffs alleged "continuous violations by the government" because the park service had chronically failed to undertake various legal obligations with respect to management of wilderness in the National Parks System. *Id.* at 589. The district court dismissed the case as time-barred. *The Wilderness Society v. Norton*, 2005 WL 3294006 at *6 (D.D.C. Jan. 10, 2005). On appeal, the D.C. Circuit affirmed the dismissal, but on alternate, lack of Article III standing, grounds. However, in *dictum* the court stated that under the circumstances of the case, "it is unlikely that [plaintiff's] complaint would be held by this court to be time-barred by 28 U.S.C. § 2401(a)." *Id.*

In the time since *Wilderness Society* was issued, the Supreme Court decided *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). In that case, the Supreme Court affirmed that the statute of limitations under § 2501 is jurisdictional and, as such, a court may not consider whether "equitable considerations warrant extending [the] limitations period." *Id.* at 134. This ruling is significant because § 2501 and § 2401 contain substantially similar language and both statutes are Congressional waivers of sovereign immunity. *W.Va. Highlands Conservancy*, 540 F.Supp.2d at 142. In addition, since issuing its opinion in *Wilderness Society*, the D.C. Circuit has affirmed its prior holding in *Spannaus* that "section 2401(a) creates a 'jurisdictional condition attached to the government's waiver of sovereign immunity." *P & V Enters.*, 516 F.3d at 1026-27. Based on this holding, D.C. district courts have been compelled to hold that § 2401 is jurisdictional, and thereby, not subject to the doctrine of continuing violations. *See e.g. W.Va. Highlands Conservancy*, 540 F.Supp.2d at 143; *Bigwood v. Defense Intelligence Agency,* 770 F.Supp.2d 315, 318 (D.D.C. 2011); *Keohane v. United Sta*tes, 775 F.Supp.2d 87 (D.D.C. 2011); *Terry v. U.S. Small Business Admin.*, 699 F.Supp.2d 49, 54 (D.D.C. 2010).

[5]    Because Claim I is time-barred, it is not necessary for the court to address defendants' remaining objections to the claim.

ORDER-13

property interest. (*Conservation Force I*, Dkt. 14 at 19.). They allege that the Service's failure to process their import permits has left them in purgatory: their personal property has been constructively forfeited, yet they cannot challenge the forfeiture because the Service has failed—for years—to process the permit applications. This, plaintiffs allege, constitutes a deprivation of their protected property interest and is therefore in "violation of both the due process clause…and section 706(2)(B) of the [APA]." (*Conservation Force I*, Dkt. 14 at 18.). It is unclear from the pleadings whether plaintiffs allege a violation of their substantive or procedural due process rights.[6] Regardless, Claim II fails because plaintiffs are unable to demonstrate either a fundamental right to or a constitutionally-protected interest in the markhor trophies.[7]

A substantive due process claim has two, distinct features: first, the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503, (1977) (plurality opinion); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"). Second, substantive due process cases must have a "careful description" of the asserted fundamental liberty interest. *Conservation Force v. Salazar (Snow Lepard)*, 677 F.Supp.2d 1203, 1210 (N.D. Cal. Dec. 30, 2009) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). Likewise, in order to

---

[6]    It appears that plaintiffs conflate the two.

[7]    Defendants contend that plaintiffs' due process claim must be dismissed because it is an independent constitutionally-based claim and, as such, is barred by the APA. Plaintiffs counter that they are not alleging an independent due process claim, but rather, the claim is brought pursuant to section 706(2)(b) of the APA. Section 706(2)(b) provides a remedy where agency action is "contrary to a constitutional right, power, privilege or immunity." 16 U.S.C. § 706(2)(b). "Plaintiffs [assert] a claim under the APA…Plaintiffs have alleged a violation of the 5th amendment [only] because it is essential to name the constitutional violation in order to legitimate a claim under section 706(2)(b)." (*Conservation Force I*, Dkt. 14 at 18.). Therefore, it is not necessary for this court to rule on defendants' contention that the due process claim is barred by the APA.

ORDER-14

state a claim for procedural due process, plaintiffs must address two distinct elements: a deprivation of a constitutionally-protected property interest and a denial of adequate procedural protections. *Brewster v. Board of Educ. of Lynwood Unified School Dist.*, 149 F.3d 971, 983 (9th Cir. 1998).

Plaintiffs claim a fundamental property right to the markhor trophies, and by extension, a fundamental right to possess the trophies in the United States. They do not state how these rights are deeply rooted in the country's history or tradition. In the context of importing endangered species, the elementary issue is not whether a party has a property interest in the specimen, but whether the party has a legal right to possess the specimen in the United States. *See B-West Imports v. United States,* 880 F.Supp. 853, 863 (CIT 1995), *aff'd*, 75 F.3d 633 (Fed. Cir. 1996) (ban on importation of Chinese defense articles did not violate due process because "[i]t is well settled that no one has a constitutionally-protected right to import products excluded by Congress").

Moreover, even if plaintiffs had received the requested permits, the permits convey only a revocable right to possess the specimen in the United States. The government retains the authority to modify, suspend, or revoke the permit at any time. *See Conti v. United States*, 291 F.3d 1334, 1342 (Fed. Cir. 2002) (holding that permit bestowed a revocable license, not a Fifth Amendment property right); *United States v. Fuller*, 409 U.S. 488, 493 (1973) (stating no property rights are created in permits and licenses); *Alves v. United States*, 133 F.3d 1454, 1457 (Fed.Cir. 1998) (same). If the permit was revoked, plaintiffs would no longer be entitled to possess the trophies in the United States, and therefore, no longer have a cognizable property interest in the specimens. Therefore, at most, plaintiffs could have acquired a right to possess the trophies, but no fundamental right or constitutionally-protected property interest in the actual

ORDER-15

specimen. Furthermore, the government has a compelling interest in protecting endangered species. *See TVA v. Hill*, 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording [the conservation of] endangered species the highest of priorities...."). The strict permitting requirements of CITES and the ESA are the least restrictive means to promote this compelling interest. *See Snow Lepard*, 677 F.Supp.2d at 1211 (citing *United States v. Adeyemo*, 624 F.Supp.2d 1081, 1090 (N.D.Cal. 2008).[8]

Accordingly, because plaintiffs are unable to demonstrate that they have a fundamental right to or a constitutionally-protected property interest in the markhor trophies, plaintiffs' due process claim fails. Claim II must be dismissed.

### 3.   Claim III: Failure to Process Trophy Import Permit Applications

Plaintiffs assert that the Secretary's failure to process permit applications for the importation of straight-horned markhor trophies violates his responsibilities under the ESA and its implementing regulations. The ESA expressly prohibits the importation of endangered species, including specimens of those species killed abroad. 16 U. S. C. § 1538(a)(1)(A). The ESA does, however, authorize a "limited exception" to this general ban. Specifically, an individual seeking to import an endangered species may do so "for scientific purposes or to enhance the propagation or survival of the affected species...." *Id*. at § 1539(a)(1)(A). In order to import an endangered species, an applicant must apply for a permit and satisfy specific criteria

---

[8]   Defendants assume, incorrectly, that plaintiffs also claim a protected property interest in the trophy import permits. Plaintiffs make no such allegation. (*See* Dkt. No. 14 at 21 ("Plaintiffs have not, will not, and never intended to *claim a property interest in enhancement permits*.") (emphasis in original)).

ORDER-16

set forth in 50 C.F.R. § 17.22. After receiving such an application, the Service determines whether or not a permit should be issued. 50 C.F.R. § 17.22(a)(2).

Plaintiffs assert that they have completed all of the requirements for a permit application under 50 C.F.R. 22 and 50 C.F.R. 13.21. Nevertheless, plaintiffs "have spent 10 years beseeching the 'offices of the department' to start doing their job, to no avail." (*Conservation Force I*, Dkt. No. 14 at 25.). Accordingly, plaintiffs bring this claim pursuant to § 706(1) and (2) of the APA to "compel the Secretary to perform his statutorily mandated responsibility to process particular permits[.]" *Id.* at 26. It is unclear from the pleadings whether plaintiffs seek to compel the Secretary to process their individual permit applications, or whether they seek to alter the Secretary's handling of all permit applications that have been, or may be, filed for the importation of straight-horned markhors. Regardless, either argument fails.

While this litigation was pending, the Service denied the four individual plaintiffs' applications for import permits. (*Conservation Force I*, Dkt. No. 20 at 1.). Accordingly, if plaintiffs seek injunctive relief with regard to their permit applications, the claim is moot and the court lacks subject-matter jurisdiction. *Conservation Force v. Salazar (Wood Bison),* 715 F.Supp.2d 99 (D.D.C. June 7, 2010) (plaintiffs' claims regarding the Service's alleged failure to process import permit applications were moot, because, while the litigation was pending, the Service denied the outstanding Wood Bison import permit applications); *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984) (when action sought to be compelled "ha[d] already occurred," injunctive and declaratory relief claims were moot). Plaintiffs argue that a live controversy exists because the plaintiff-organizations have members who wish to and will participate in future markhor hunts, and because one organization "will always have an interest in the outcome of any claims [related to the processing of import permits]." (*Conservation Force I*, Dkt. No. 24 at 5.).

ORDER-17

These arguments are unavailing. Possible future applicants, as courts have long recognized, amount to mere "potential plaintiff[s] who, like any other member of the public, might voice concern over future harm that could be inflicted as a result, of an agency's program, but "who lacked the standing needed to have a federal court decide the merits of the a particular and immediate dispute." *National Wildlife Fed'n v. Dep't of Interior*, 616 F.Supp. 889, 892 (D.D.C. 1984). Similarly, an organization's ongoing interest in a topic, without a particular and immediate dispute, is also insufficient because the interest is purely of a "hypothetical character." *Id*. Thus, the interested organizational plaintiffs here are left "indistinguishable from any other citizen or group that might wish to have a clarification of law from an Article III court—not for the purpose of addressing a particular harm—but for mere 'convenience.'" *Id*. (internal quotation, citation omitted).

If, instead, plaintiffs seek to challenge the Service's handling of all permits that have been, or may be filed, for importation of markhor trophies, the court is prohibited from reviewing such a claim. Under the APA, a court's review is limited to a "final agency action." *See* 5 U.S.C. § 704; *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"). A "final agency action," in turn, is limited to "an identifiable action or event." *Lujan*, 497 U.S. at 899. This requirement, that a final action be limited to "an identifiable action or event," precludes federal court jurisdiction over suits seeking broad, programmatic relief. *Lujan*, 497 U.S. at 891 ("respondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.") (emphasis in original).

The APA's bar on programmatic challenges "is motivated by institutional limits on courts which constrain [their] review to narrow and concrete actual controversies." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000). In limiting review to particular actions, rather than programmatic attacks, courts "avoid encroaching on the other branches of government, [and] continue to respect the expert judgment of agencies specifically created to deal with complex and technical issues." *Id.* This prohibition applies equally to an agency's alleged "failure to act." 5 U.S.C. § 551(13) ("agency action" is defined to include an agency's "failure to act"); *Norton v. Southwest Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 63 (2004).

While the court is sympathetic with plaintiffs' understandable frustration in dealing with an agency that appears to be so dilatory in its obligations as to border on dysfunctional, this is exactly the type of broad programmatic challenge that is prohibited by the APA.[9]  *SUWA*, 542 U.S. at 64 (APA precludes broad programmatic attack); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) (litigant cannot seek wholesale improvement of this program by court decree); *Sierra Club*, 228 F.3d at 566 ("past, ongoing, and future timber sales approved by Forest Service" not limited to discrete final agency actions); *Friends of the Earth v. U.S. Dep't of Interior*, 478 F.Supp.2d 11, 25 (D.D.C. 2007) (off-road vehicle authorization at 18 park units not "discrete" agency action). Accordingly, Claim III is not subject to judicial review and must be dismissed.

### 4.   Claim IV:  Breach of Bundle of ESA Duties

Plaintiffs' Fourth Claim alleges that the Service's practices violate § 1537(b) of the ESA. This section mandates that the Secretary cooperate with foreign nations' conversation programs. *See* 16 U.C.S. § 1537(b). Plaintiffs allege that the Service has impeded cooperation in two ways:

---

[9]    The court notes that there appears to be a pattern of dilatory action on the part of the Service. *See, e.g.*, *Conservation Force (Wood Bison)*, 753 F.Supp.2d at 35 (stating "to be sure, multi-year delays to process plaintiffs' permit applications certainly do not indicate an efficient permit processing system").

ORDER-19

(1) by failing to issue the 12-month finding on the downlisting request, and (2) by failing to process import permits in a timely manner. (*Conservation Force I*, Dkt. No. 14 at 29.). To the extent that the § 1537(b) allegations are based on the 12-month finding, the claim is time-barred. To the extent the allegations are based on the Service's failure to process plaintiffs' permit applications, the claim is moot. Accordingly, Claim IV must be dismissed.

### 5.   Claim V: Failure to Perform 5-Year Status Review

Finally, Plaintiffs object to the Service's failure to perform a five-year review of the status of the markhor ESA listing pursuant to 16 U.S.C. 1533(c)(2).  Defendants argue that this claim must be dismissed because plaintiffs' January 14, 2009 NOI did not include notice that plaintiffs intended to bring suit on this claim. The court agrees. Under the ESA, a prospective plaintiff must provide written notice to the Secretary at least sixty days before suing for an alleged ESA violation. *See* 16 U.S.C. § 1540(g)(2). "This requirement is 'mandatory and jurisdictional.'" *Conservation Force v. Salazar* (*Wood Bison*), *715 F.Supp.2d 99, 103*; quoting *Research Air v. Norton*, No. 05-cv-623 (RMC), 2006 WL 508341 at *10 (D.D.C. 2006).  As a waiver of sovereign immunity, the 60-day notice provision must be complied with strictly, and it cannot be avoided by equitable, "flexible," or "pragmatic" considerations. *Hallstrom v. Tillamook County*, 493 U.S. 20, 26-28 (1989). The January 14, 2009 NOI states that plaintiffs intend to file suit based on the Service's "illegal practice of not issuing trophy import permits for 'endangered' listed species under the 'enhancement' provisions of the ESA" and based on the Service's failure to make "a 12-month finding on the petition to downlist the markhor in Pakistan." (*Conservation Force I*, Dkt. No. 11, Ex. 1.). The NOI does not reference the Service's alleged failure to complete a five-year status review. *Id.* Accordingly, Claim V must be

dismissed for lack of notice. *See Friends of Animals v. Salazar*, 670 F.Supp.2d 7, 13 (D.D.C. 2009) ("failure to provide sixty-day notice prior to bringing its claim" requires dismissal).

## B.    *CONSERVATION FORCE II*

On October 27, 2009, the Service denied each of the trophy import permit applications submitted by the individual plaintiffs. (*Conservation Force I*, Dkt. No. 21.). On November 3, 2009, plaintiffs submitted a second NOI, notifying the Service that they intended to bring suit based on the Service's "failure to conduct a five-year review of the markhor in the Torghar Region of Pakistan," and for "violat[ing] [] the ESA in den[ying] [] the markhor import applications of [plaintiffs]." (*Conservation Force II*, Dkt. No. 10, Ex. 2). On July 23, 2010, plaintiffs filed *Conservation Force II*. (*Conservation Force II*, Dkt. No. 1.). Defendants now move to dismiss *Conservation Force II* Claims II and III in their entirety, and Claims I and IV to the extent that those claims are based on the Service's alleged violation of § 1537(b) of the ESA. (*Conservation Force II*, Dkt. No. 9.). Defendants assert that Claim II—the Service's alleged failure to undertake the five-year status review—must be dismissed because plaintiffs failed to provide the requisite 60-days notice prior to bringing suit on this claim. Defendants argue that Claim III—denial of plaintiffs' due process rights—must be dismissed because plaintiffs do not have a constitutionally protected property in an import permit. Defendants also argue that the § 1537(b) allegations in Claims I and IV must be dismissed because maladministration claims are not judiciable under the APA.

### 1.    Claim II: Failure to Perform Five-Year Status Review

Defendants argue that Claim II, the Service's failure to perform the five-year status review, must be dismissed for lack of subject-matter jurisdiction because plaintiffs failed to file a timely 60-day notice of intent to sue on this claim. Defendants concede that the second NOI

ORDER-21

specifically referenced the Service's failure to perform the five-year status review, but argue that the notice was not timely because the parties were already litigating the issue in *Conservation Force I*. Therefore, defendants argue, the Service was not given a sufficient "litigation-free window" within which to correct its error.

"The purpose of the 60-day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue." *Sw. Ctr. For Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998) (internal quotation marks omitted). "When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted. *The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation*." *Id*. (emphasis added) (internal quotation marks omitted). Here, plaintiffs submitted the second NOI on November 3, 2009 and did not file *Conservation Force II* until July 23, 2010, well after 60 days had passed. Nevertheless, defendants argue that plaintiffs failed to satisfy the purpose of the rule, which is to give the Service an opportunity to take corrective actions, if warranted, prior to litigation commencing. Defendants argue that since the parties have been litigating this issue since early 2009 when *Conservation Force I* was filed, the Service has never been given a "litigation-free window" within which to take corrective action.

The court agrees. When plaintiffs submitted their intent to sue letter in November 2009, the parties were already litigating the same five-year review claim in *Conservation Force I*. Thus, plaintiffs did not give the Service an opportunity to "review [its] action and take corrective measures" relating to the five-year review prior to being sued. Because plaintiffs failed to provide the Service with a litigation-free window to take corrective action or to otherwise resolve the dispute, plaintiffs have not satisfied the ESA notice requirement. *See Hallstrom v. Tillamook*

ORDER-22

*County,* 493 U.S. 20, 26-28 (1989) (statutory 60-day notice requirements are "mandatory conditions precedent" and failure to comply with the notice requirement requires dismissal of action); *Wood Bison*, 715 F.Supp.2d at 104 (dismissing claim for failing to comply with 60-day notice requirement, but noting that plaintiff can bring a new suit after they have provided proper statutory notice); *Friends of Animals*, 670 F.Supp.2d at 13 (dismissing claim for failing to provide 60-day notice). Allowing plaintiffs to cure their jurisdictional failure simply by bringing a new lawsuit while litigating the claim in another action would eviscerate the purpose of the 60-day notice requirement. *See Hallstrom*, 493 U.S. at 32 (requiring dismissal "after years of litigation and a determination on the merits"); *Friends of Animals*, 670 F.Supp.2d at 13 (rejecting plaintiffs' request to cure defect by amendment of complaint and dismissing claim). Accordingly, Claim II must be dismissed.

### 2.   Claim III: Denial of Plaintiffs' Due Process Rights

Plaintiffs allege that the Service's improper, arbitrary and capricious denial of their enhancement permits constitutes a deprivation of the constitutionally mandated process in the Fifth Amendment, as well as § 706(2)(b) of the APA. Plaintiffs concede that they do not have a constitutionally protected interest in "any kind of permit, anywhere, at any time." *Id.* at 10. Nevertheless, they contend, they do have "legal protection from arbitrary, capricious and irrational denials and fundamentally unfair treatment" and a right "to genuine permit application processing and a rational determination." *Id.* at 10-11. This court agrees. However, as previously discussed in Section III(A)(2), this is not a due process claim that can be maintain pursuant to § 706 of the APA. Accordingly, Claim III must be dismissed.[10]

---

[10]   The court notes, however, that plaintiffs' assertion that the Secretary's denial of the permits was "arbitrary, capricious, and an abuse of discretion" may be brought pursuant to § 706 of APA, which plaintiffs assert in Claim I.

ORDER-23

### 3.    Claims I and IV: Section 1537(b) Allegations

In Claim I, plaintiffs seek judicial review of the Service's denial of the individual plaintiffs' trophy import permit applications. (*Conservation Force I*, Dkt. No. 10 at 13.). The claim raises seven different statutory violations. *Id. citing* 16 U.S.C. §§ 1533, 1536, 1537 and 1539. In Claim IV, plaintiffs assert that the Secretary has violated a number of his duties under the ESA, in particular, the Secretary's duty to "encourage" foreign nations to "provide for the conservation of fish or wildlife…." *Id.* at 14 citing § 1537(b). Defendants move to dismiss Claims I and IV to the extent that the claims are based on section 1537(b) violations.

The ESA citizen suit provision provides, in relevant part, that:

> any person may commence a civil suit on his own behalf—(A) to enjoin any person, including the United States and any other governmental instrumentality or agency…who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or…(C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section [4] of this title which is not discretionary with the Secretary.

16 U.S.C. § 1540(g)(1).   Defendants assume, incorrectly, that plaintiffs bring the § 1537(b) claims pursuant to subsection (C). However, in their opposition to defendants' motion to dismiss, plaintiffs clarify that the claims are filed pursuant to subsection (A). (*Conservation Force I*, Dkt. No. 14 at 27.). Presumably plaintiffs concede that the alleged violations of § 1537(b) would not be actionable under subsection (C). *See, e.g., Conservation Force v. Salazar (Wood Bison II)*, 753 F.Supp.2d 29, 34 (D.D.C.  Nov. 30, 2010) (it is unambiguous that subsection (C) only covers violations of Section 4 of the ESA).

Nevertheless, plaintiffs fare no better under subsection (A). The Supreme Court has interpreted subsection (A) to allow an individual to bring suit only to enforce the substantive provisions of the ESA, not to challenge the Service's implementation and administration of the Act. *Bennett v. Spear*, 520 U.S. 154, 174 (1997); *Conservation Force (Snow Leopard) v. Salazar*,

ORDER-24

677 F.Supp.2d 1203, 1211-1212 (N.D. Cal. 2009). In *Bennett*, the Court held that the term "violation" in the citizens-suit provision must be interpreted in a manner that is consistent with how the term is used elsewhere in the Act. *Bennett*, 520 U.S. at 174. The Court reasoned that interpreting the term "violation" broadly (as plaintiffs seek to have the court do here) would render the other parts of the citizen-suit provision superfluous. *See id.* The Court thus held that the term "'violation'…cannot be interpreted to include the Secretary's maladministration of the ESA," and, accordingly, such claims are "not subject to judicial review under [the citizens-suit provision of the ESA]. *Id.* at 174; *see also, Earth Island Institute v. Albight*, 147 F.3d 1352, 1357 (Fed. Cir. 1998) ("the Supreme Court has clarified that the ESA offers no independent jurisdiction to challenge a federal agency's implementation of the Act).

Plaintiffs' allegations that the Service failed to cooperate with Pakistani's conservation program alleges nothing more than maladministration of the ESA. Adjudicating errors on the part of the Secretary in administering the ESA "would effect a wholesale abrogation of the APA's 'final agency action' requirement." *Bennet*, 520 U.S. at 174. "Merely because plaintiffs feel that defendants' actions do not adequately cooperate with other nations' conservation programs does not logically lead to the conclusion that a 'violation' of ESA has occurred." *Snow Lepard*, 677 F.Supp.2d at 1211-12 (dismissing ESA § 1537(b) claims as "nothing more than maladministration" claims and, thereby, not actionable under section 1540(g)(1)(A)). Accordingly, plaintiffs' § 15379b) claims are not subject to judicial review under § 1540(g)(1)(A).

Nor do plaintiffs' § 1537(b) allegations fare better under the general review provision of the APA. *See Lujan*, 497 U.S. at 882 (because ESA does not provide judicial review of claim, general review provisions and limitations of APA apply by default). Plaintiffs' allegations that

ORDER-25

the Secretary violated § 1537(b)'s broad "encouragement" mandate lacks the requisite specificity to support judicial review under the APA. *See Norton v. Southwest Utah Wilderness Alliance ("SUWA")*, 542 U.S. 55, 66 (2004). In *SUWA*, environmental groups brought suit pursuant to the APA to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The groups claimed (much as plaintiffs do here) that the government had violated a broad statutory mandate to manage wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness." *SUWA*, 542 U.S. at 59 (quoting 43 U.S.C. § 1782(c)). The Supreme Court rejected the claim, holding that the APA did not empower a court to compel general compliance with such broad statutory mandates. *Id.* at 66-67.

As the Court made clear, "a claim under § 706(1) [of the APA] can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required* to take." *SUWA*, 542 U.S. at 64 (emphasis in original). In the case of the non-impairment mandate, the Court noted that "[w]hile Section 1782(c) is mandatory as to the object to be achieved…it leaves [the government] discretion to decide how to achieve that objective [and] assuredly does not mandate, with the clarity necessary to support judicial action under § 706(1)" a specific agency action. *Id.* at 66. Accordingly, the Court found that the claim "lack[ed] the specificity requisite for agency action," and thus was not subject to judicial review under the APA. *Id.* The APA limitations, the Court explained, are intended to (a) protect agencies from undue judicial interference and (b) protect courts from having to enter "general orders compelling compliance with broad statutory mandates" that would 'inject[] the judge into day-to-day agency management." *Id.* at 66-67.

Like *SUWA*, plaintiffs challenge a broad statutory mandate. Like the non-impairment mandate, § 1537(b) is mandatory only in the object to be achieved ("encouragement"), not in

ORDER-26

requiring any specific action. Indeed, while the Secretary has a general mandate to "encourage" foreign countries to "provide for" conservation, § 1537(b) leaves the government unfettered discretion to decide how to achieve the objective. The elements of what such an action might entail, including, among other things, its manner, timing, scope, nature and limits, are undefined. Accordingly, plaintiffs attempt to compel compliance with this broad statutory mandate fails for the same reasons articulated in *SUWA*.

In addition, the fact that § 1537(b) provides no guidance or meaningful standard against which to judge what constitutes "encouragement" of a foreign country's conservation efforts is also fatal to plaintiffs' claim. An agency action is reviewable "except to the extent that agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Association of Irritated Residents v. EPA*, 494 F.3d 1027, 1030-31 (D.C. Cir. 2007). Agency action is considered committed to agency discretion when there is "no law to apply," that is, where there are no "standards, definitions, or other grants of power [that] deny or require action…or confine an agency within limits as required by the Constitution." *Diebold v. United States*, 947 F.2d 787, 789 (6th Cir. 1991) (quoting S. Doc. No. 248, 79th Cong., 2d Sess. 212, 275 (1946)). "Review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Simply put, there are not standards for this court to apply to adjudicate whether the Secretary failed to "encourage" foreign nations within the meaning of § 1537(b). As such, the § 1537(b) allegations are not reviewable under the APA. *See Association of Irritated Residents*, 494 F.3d at 1030-31 (court lacked subject-matter jurisdiction where action was committed to agency discretion by law). For the foregoing reasons, the § 1537(b) allegations contained in Claims I and IV must be dismissed.

ORDER-27

IV.   **CONCLUSION**

For the reasons explained above, the court hereby:

1.      GRANTS Defendants' Motion to Dismiss *Conservation Force I*;

2.      STRIKES Plaintiffs' Motion for Summary Judgement (*Conservation Force I*, Dkt. No. 16);

3.      DISMISSES in its entirety *Conservation Force I*;

4.      DENIES Defendants' Motion to Stay *Conservation Force II*;

5.      GRANTS in part and DENIES in part Defendants' Motion to Dismiss *Conservation Force II*. The 16 U.S.C. § 1537(b) allegations contained in Claims I and IV are not subject to judicial review under 16 U.S.C. § 1540(g)(1)(A) or the APA and are DISMISSED. Plaintiffs' allegations in Claims I and IV that the Service arbitrarily and capriciously denied the import trophy permits remain. Claim II is DISMISSED due to lack of subject-matter jurisdiction. Claim III is DISMISSED for failure to state a claim upon which relief can be granted;

6.      In as much as Defendants' Motion to Dismiss has been denied as to portions of Claims I and IV, the Government should file the administrative record for this matter. In addition, the parties are instructed to proceed with any additional motions promptly; and

7.      The parties should meet and confer so as to provide the court with an updated report as to what issues remain in the case and what motions will be brought. Said report shall be filed with the court no later than 30 days from the date of this order.

DATED this 1st day of September, 2011.



Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER-28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ORDER-29